**UNITED STATES of America,
Plaintiff-Appellee,**

v.

**Frank Richard COPPOLA,
Defendant-Appellant.**

No. 75–1001.

United States Court of Appeals,
Tenth Circuit.

Argued Nov. 10, 1975.

Decided Dec. 8, 1975.

Peter M. Shannon, Atty., Dept. of Justice (E. Edward Johnson, U. S. Atty., and Jerome M. Feit, Atty., Dept. of Justice, on the brief), for plaintiff-appellee.

James Robert Wyrsch, Kansas City, Mo., for defendant-appellant.

Before LEWIS, Chief Judge, and HOLLOWAY and DOYLE, Circuit Judges.

WILLIAM E. DOYLE, Circuit Judge.

On November 28, 1973, a judgment was entered on a jury verdict which found the defendant, Frank Richard Coppola, guilty of first degree murder and conspiracy to commit murder, the alleged victim being Willard Hardaway. The statutes alleged to have been violated are 18 U.S.C. Sec. 371 (applicable to Count I), and 18 U.S.C. Sec. 1111. The defendant was sentenced to life imprisonment on the murder conviction and to five years imprisonment on the conspiracy. The sentences were ordered to run concurrently.

The identical cause has been before this court previously. On that occasion also the defendant was found guilty and the same sentences were imposed. The opinion in the prior case is reported in 479 F.2d 1153 (10th Cir. 1973).

The defendant was charged together with one Joe Cordova, Fred Molina and Natividad Baca. Prior to the trial, the charges against Cordova were dismissed. Those against Molina and Baca were reduced to manslaughter. As a result of the reduction, the defendants entered pleas of guilty and received sentences of ten years.

The background facts are set forth sufficiently in our prior opinion so that we need only give a general outline, keeping in mind that the government's theory was that Coppola, who was an inmate of the penitentiary at Leavenworth, Kansas, contracted with inmates Baca, Molina and Cordova to have Hardaway, also an inmate, killed. This resulted from Hardaway's alleged failure to deliver to Coppola a quantity of heroin which Coppola had arranged to have delivered inside the penitentiary.

As in the first trial, the basic factor was defendant's allegedly being the major supplier of heroin within the U. S. Penitentiary at Leavenworth. In our former opinion we held this fact relevant to prove the motive. The important aspect of this was that the homicide resulted from a dispute between appellant and Hardaway as to the amount of heroin

delivered to Coppola by Hardaway. Hardaway had agreed on behalf of Coppola to have his (Hardaway's) wife secrete a package of heroin into the prison. Although the entire package was to have been delivered to Coppola, she was instructed by Hardaway to divide the heroin into two packages. One of these was delivered to Coppola, who at once recognized that one-half of the original quantity was missing. He held Hardaway responsible for this and at once proceeded to arrange a contract to have Hardaway killed. Coppola said he did this to maintain his control of the heroin traffic within the penitentiary.

On September 11, 1968, Hardaway was killed in his cell. The killer, Molina, struck him with a heavy piece of pipe which was later discovered in a nearby trash barrel. Inmate Baca was supposed to have acted as a lookout.

The witness, Marie Russell, the former wife of Hardaway, testified at the present trial that Hardaway had arranged for her to transport some heroin into the penitentiary on the day that he was to have graduated from a college course that was offered within the institution. According to her testimony, she had received the heroin at her home in Illinois. The arrangement was for the Hardaways to receive $500.00 from Coppola when she delivered it. She followed Hardaway's instructions and put it in two separate packages. Hardaway disposed of the packet which had been held back and not delivered to Coppola. When Deering, another inmate, delivered the package to Coppola, the latter said that all of his heroin was not there and that he would "take care of it." The witness, inmate Gawne, repeated this. A week later defendant told Deering that he had paid two Chicanos $500.00 to kill Hardaway. (He was apparently then referring to Cordova and Molina). Later, following transfer of Coppola and the other participants to the institution at Marion, Illinois, Coppola told Deering that Molina had killed Hardaway. The inmate witness, Gawne, corroborated this.

An inmate witness, Killian Joe Herman, gave testimony which is particularly controversial on this appeal. Herman was shown to have been an orderly in the segregation division of the prison where Coppola, Molina, Cordova and Baca, the principals in the alleged murder of Hardaway, were confined. Herman had access to all of these individuals, and the controversial testimony consists of statements which he recounted to Coppola which originated with Molina and which in turn brought about comments from Coppola. Coppola was also shown to have made numerous admissions to Herman, and Herman described these on the witness stand. Coppola's attorney does not seriously dispute the court's action in receiving these admissions. He does contend that the testimony in which Herman described the statements that Molina in turn had given constituted hearsay and were not admissible under any exception. The main contention is that Coppola did not expressly or impliedly adopt or embrace these statements of Molina.

At the trial, defendant denied any involvement in the killing and offered the testimony of Cordova and Molina, both of whom testified that Coppola had nothing to do with the killing; he had not tried to kill Hardaway. Molina also testified that Hardaway had threatened him because he (Molina) owed him money and that he had assaulted Hardaway only because he was afraid of him.

Many contentions are offered. We do not consider each one, but we do take up those which have some appearance of merit.

*First,* that it was error to allow the witness, Killian Joe Herman, to testify to purported conversations that he had had with Molina. It is argued that these were not part of any conspiracy which may have existed and that the statements were not shown to have been voluntarily given; it was not shown that defendant had adopted those statements. A further claim is that it was error for the court to receive the testimony of the

former Mrs. Hardaway as to her conversations with her husband.

*Second,* that the court erred in permitting the government to introduce evidence of other crimes. For the most part, this was evidence pertaining to Coppola's transactions in narcotics within the institution.

*Third,* that the court erred in failing to adequately instruct the jury not to allow anyone to communicate with them and not to read published accounts in the course of the trial.

*Fourth,* that it was error to not have the defendant present during certain pretrial hearings. This is meritless on its face.

*Fifth,* that it was error for the trial court to refuse instructions on the lesser included offenses of second degree murder, voluntary manslaughter, and involuntary manslaughter.

*Sixth,* that it was error for the trial court not to grant a mistrial when records of the United States Penitentiary were not produced until late in the trial, and it is further contended that it was error for the government to fail to produce the witness Lee Gordon.

Other errors include the presence before the grand jury of a special assistant to the Attorney General; the failure of the court to compel the government to elect between conspiracy and first degree murder; the court's rulings with respect to cross-examination of the various witnesses. These are also frivolous.

We are of the opinion that the judgment of the district court entered on the jury verdicts is to be affirmed.

## I.

## THE HEARSAY PROBLEM

A. *The Herman Testimony.*

The primary challenge advanced by appellant as a basis for reversal is the alleged error of the trial court in receiving certain of the testimony of one Killian Joe Herman, an inmate who testified at great length for the government. He described conversations had with appellant, some of which were received as admissions, and others, the enbattled ones, with respect to statements made by inmate Fred Molina to Herman when Herman, who was an orderly in the segregation area, made deliveries of heroin on behalf of Coppola to Molina. These deliveries were part of Molina's compensation for wielding the pipe that killed Hardaway. The problem assumes importance because at the first trial we held that at least some parts of Herman's testimony were hearsay and inadmissible. Herman at that trial testified that he had had a conversation with inmate Cordova, who was allegedly a prime mover in the conspiracy to murder Hardaway. The testimony which was the object of a pinpoint attack at the first appeal is described in our opinion as follows. As we have mentioned, Herman was speaking.

> \* \* \* He said Cordova "told me that Frank had hired him to get at somebody to kill Mr. Hardaway and he first approached him, wanted him to do it . . . and then Cordova said that he went ahead and made arrangements with Molina to have him do it."

479 F.2d at 1161.

> \* \* \* Herman was also allowed to testify over objection as to a statement made to him by Molina. Herman testified as to this: "He [Molina] said he wasn't getting enough stuff. That he wanted all his stuff and he was getting messed around."

479 F.2d at 1161.

It was argued on the previous appeal that these statements were admissible as statements of co-conspirators. Inasmuch as the statements were made months after the murder of Hardaway, we simply held that these were hearsay and not admissible under the co-conspirators exception; that the ruling admitting them was at odds with the Supreme Court's decisions in *Grunewald v. United States,* 353 U.S. 391, 77 S.Ct. 963, 1 L.Ed.2d 931 (1957) and *Krulewitch v. United States,* 336 U.S. 440, 69 S.Ct. 716, 93 L.Ed. 790 (1949). We mentioned in passing that

there was no indication that appellant had adopted the statements, whereby they could come in under some other exception of the hearsay rule.

At the trial which we now review, Cordova's statement was not repeated by the witness Herman. The Molina statement was put in, but responsive comments of Coppola were presented as adoptions. Molina was said by Herman to have told him that, referring to the heroin, "it was not enough of it and he wanted the rest of his stuff." Herman said that when he told Coppola this, the latter told him that he had some more stuff coming and that he would make it up and send him all of his stuff and $500.00.[1]

Subsequent to the described conversation, Herman delivered the heroin to Molina and Molina accepted. He described this conversation (with Molina) to Coppola saying that he "delivered the stuff and the guy would wait for the rest of the money and he would get together on the money." Herman further testified that he told Coppola that Molina said "to cool it and not to do nothing." Coppola's response, according to Herman, was that he, Herman, was to tell Molina that Coppola had some more stuff coming and would keep him in heroin "as long as they was together and had the stuff available, access to it."

 Our view is that the hearsay statements of Molina were adopted by Coppola and thus Herman's recounting of them came within the party admissions exception to the hearsay rule.[2] See Wigmore on Evidence Sec. 1069; see also Federal Rule of Evid. 801(d)(2) (eff. July 1, 1975).

As to whether at the first trial the government failed to have its evidence organized so as to show Coppola's adoption, we do not know. This explanation seems likely because they were relying wholly (at the first trial) on the

---

1. In the same context, Coppola explained in response to Herman's question as to why he had become involved. This was not a direct response. Its content nevertheless constitutes an admission of Coppola and we said that it was admissible in our first opinion. It reads:

 A. I asked Mr. Coppola, I said, "Frank," I said, "you had everything going for you," I said, "why did you get everything messed up and bring that stuff over here and put all the heat over here? You already got a lot of heat on the place, and everybody hates you and everything." And he said, "Joe, if I had stood for Hardaway beating me for four ounces and a half of stuff," he said, "it's all over the yard," and he said, "also then everybody would start beating me. I've already been beat for a bunch of stuff through my pushers, and money also that was supposed to have been sent from different people for heroin that I've given them and haven't seen it." And he said, "If I done that," he said, "I would be nothing if I let them people steal my stuff and run over me like that." And he said, "Therefore," he said, "I hired—" didn't say, "hired," he said "I got Moco Cordova and approached him 'cause he was one of my better friends, and known a long time, and he handled a lot of stuff for me, and he lost a lot of stuff for me," I mean, "heroin." That's what Coppola told me.

2. The record in the first trial was bare of any significant evidence that Coppola adopted Molina's statements via Herman as true. It is not enough that Herman recounted Molina's statements in Coppola's presence and Coppola was silent or did not otherwise respond. Testimony that an accused adopted statements of another person may be let in as an adoptive admission only if it appears the accused understood and unambiguously assented to those statements. E. g. Naples v. United States, 120 U.S.App.D.C. 123, 344 F.2d 508, 511 (1964). See Uniform Rules of Evidence 63(8) (making admissible "[as] against a party, a statement . . . of which the party with knowledge of the content thereof has, by words or other conduct, manifested his adoption or his belief in its truth); Calif. Evidence Code Sec. 1221 (semble). McCormick, Evidence Sec. 246 (1954). A trial court should be most reluctant to credit mere silence—inherently ambiguous—as "conduct" sufficient for adoption of an inculpatory statement. Compare the special circumstances of United States v. Schroeder, 433 F.2d 846, 849–50 (8th Cir. 1970), cert. denied sub nom., Allen v. United States, 400 U.S. 1024, 91 S.Ct. 590, 27 L.Ed.2d 636 (1972). There, although the accused did not respond with a direct affirmance to a statement that he participated in a bank robbery, he described what his activity had been in the course of the bank robbery. Under such circumstances the court held him to have made an adoptive admission of the statement of participation.

exception allowing statements of co-conspirators to be received. We need not speculate as to this. The important factor is that the adoptive testimony of Coppola *was* offered at the present trial.

The numerous other admissions given by Coppola to Herman constituted no problem at the first trial and we see no difficulty in their having been received at the instant trial.

B. *The Argument of the Government that the Herman Testimony was Admissible by Reason of the Supreme Court's Decision in Anderson v. United States, 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1975).*

■ The government has predicated its argument in favor of admissibility on the contention that the Supreme Court's decision in *Anderson v. United States,* 417 U.S. 211, 94 S.Ct. 2253, 41 L.Ed.2d 20 (1975) has introduced a new dimension which changes the applicable law. We disagree. True, an effort was there made to expand the scope of the co-conspirator rule. This was, however, rejected by the Supreme Court. The disputed evidence considered by the Court was that of two individuals who had testified at the district court level. The statements of these witnesses given at an election contest in state court had been allowed by the U. S. District Court to be introduced. These were statements which ordinarily would have been considered hearsay as being outside the former testimony exception since the issues in the two proceedings were not identical. The Supreme Court pointed out that these statements were properly received for the limited purpose of showing that a statement had been made; and that since they had not been received testimonially to establish truth of the content, were not hearsay. Contrary to the government's contention, this holding does not introduce anything new. Circumstantial use of hearsay has always been admissible. In our case the testimony of Herman relating to the statements of Molina were offered *testimoni-*

*ally* (to prove the truth thereof). This part of the government's proof as to the involvement of Molina at the behest of Cordova therefore fails to qualify as circumstantial use of hearsay. The jury was free to consider it without limitation.

C. *Testimony of Marie Hardaway.*

Appellant also claims that the testimony of Mrs. Hardaway relating statements of her husband in which he instructed her on bringing heroin into the prison was inadmissible as hearsay. The conversation took place about one month before the murder. The defense argues that the Hardaway statements fall outside the co-conspirator exception to the hearsay rule since Hardaway could not be a co-conspirator to his own murder.

■ We consider the Hardaway statements in conversations with his wife to be competent evidence. Hardaway was a co-conspirator with Coppola in the scheme to bring drugs into the prison, and the fact of this drug-smuggling conspiracy was unquestionably relevant to prove the motive for the murder and murder conspiracy with which Coppola was charged. *See, e. g., United States v. Braasch,* 505 F.2d 139, 148–49 (7th Cir. 1974) (Clark, Justice). The fact that the drug-smuggling conspiracy was not charged in the indictment does not render evidence of it inadmissible. The co-conspirator hearsay exception nevertheless applies so long as proof of the conspiracy did not rest solely on evidence brought in because of the exception. Acts and declarations of one alleged co-conspirator are admissible against another co-conspirator where the conspiracy, even if not contained in the indictment, is proved at trial through independent evidence. *Mares v. United States,* 383 F.2d 805, 809–10 (10th Cir. 1967); *Kelley v. United States,* 364 F.2d 911, 913 (10th Cir. 1966); *Bartlett v. United States,* 166 F.2d 920, 925 (10th Cir. 1948); 22A C.J.S. Criminal Law § 756.

The reason for the exception is that once the conspiracy has been proven the statements which have been made (if rel-

evant) are regarded, by reason of the relationship, as trustworthy and as having probative value.

### D. *The Contentions that the Accused was Deprived of Counsel.*

 We have fully considered the ingenious argument on behalf of appellant that there has been a violation of the Sixth Amendment since Coppola was deprived of counsel when he made the admissions to witness Herman. In essence, counsel applies the *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966) and *Escobedo v. Illinois,* 378 U.S. 478, 84 S.Ct. 1758, 12 L.Ed.2d 977 (1964) doctrines. These cases in effect held that defendant's rights to remain silent and to have counsel exist during police interrogation. The underlying reason for this result is that the interrogation stage of the proceedings is regarded as an important stage leading to the trial. True, it is pretrial procedure, and in the absence of protective rules it can render the trial a nullity. It assumes, however, official interrogation. Here we are not faced with these problems. The utterances are given in personal conversations and are on their face voluntary and spontaneous. They are not the product of police interrogation, direct or indirect. They do not result from efforts to bring about self-incrimination. Hence we see no basis for the argument that there have been violations of the Fifth, Sixth and Fourteenth Amendments to the Constitution.

## II.

### THE CONTENTION THAT THE TRIAL COURT ERRED IN ALLOWING THE GOVERNMENT TO BRING EVIDENCE OF OTHER CRIMES ON THE PART OF THE DEFENDANT AND THE WITNESSES AND IN ALLOWING THE GOVERNMENT TO REFER TO THESE ACTS IN CLOSING ARGUMENTS

In connection with the previous review we called attention to certain statements and arguments of the prosecutors, but said that these arguments, while invalid, did not furnish a basis for reversal standing alone. We also made clear that the heroin issue insofar as it showed a motive for the murder was relevant. This section of our opinion is emphasized in demanding a reversal on these same grounds. The main thrust of our comments, 479 F.2d at 1163, pertained to the unrestrained closing arguments on the part of the special attorney, Department of Justice.

We have examined the transcript, and particularly that testimony having to do with the heroin traffic within the penitentiary and the defendant's efforts to control it. It is true that there was a good deal of evidence on this subject, but we are unable to say that this testimony was irrelevant to a showing that the defendant had a motive to maintain his control of this heroin traffic. The government developed evidence as to the relationships which the defendant had with the various people involved and this was relevant to showing the existence of the motive which was alleged in the indictment.

At the first trial Coppola did not testify. At the trial in question, however, he took the witness stand and as a witness offered a great amount of the testimony which linked him to the heroin traffic at Leavenworth. This evidence was given on direct examination. The defense brought out from Coppola the fact that he was then serving 10 years "for all the heroin business you heard in this courtroom" and was "involved quite deeply, quite heavily" in narcotics traffic at Leavenworth. Coppola explained at great length his involvement in heroin. He explained how he recruited Cordova as a pusher and how Cordova was paid. He explained how he handled and packaged the heroin and how he arranged for heroin to be brought into the prison. This evidence was intended to support the defendant's contention that he had arranged for an additional heroin shipment to be delivered through Hardaway and that therefore at the time of Harda-

way's death he had a countervailing motive to keep Hardaway alive.

On cross-examination, the government asked a good many questions about Coppola's heroin activity, but these questions were within the scope of the direct examination and seemed more aimed at attacking the motive that Coppola offered than in emphasizing the heroin dealing. The prosecution's questions in a vast majority of instances were not objected to.

■ As to the evidence that the government offered, it is to be noted that inasmuch as Molina was admittedly the actual killer, it was relevant to introduce evidence of Coppola's heroin traffic so as to demonstrate his motive for and connection with the murder. After all, the government was seeking to show that Coppola was trying to maintain his position as the principal narcotics distributor at Leavenworth. Herman's testimony supported this, and so the government's evidence in this area had probative value and was thus properly admitted. *See United States v. Parker,* 469 F.2d 884, 890 (10th Cir. 1972); *United States v. Pauldino,* 443 F.2d 1108, 1113 (10th Cir.), *cert. denied sub nom., Bridwell v. United States,* 404 U.S. 882, 92 S.Ct. 204, 30 L.Ed.2d 163 (1971). *Cf.* Federal Rules of Evidence 403, 404(b).

From a careful examination of the record, we are convinced that the government organized and presented its evidence in an effort to validly utilize this evidence and not to exploit it as a means in and of itself to convict the defendant.

■ As to the contention of the defendant that the closing arguments were prejudicial, we have examined these in context and from this examination we conclude that the conduct which was criticized on the last review was not present in this case. The closing arguments were based on the evidence in the case and did not involve any statement of opinions or characterizations. The case was tried in a workmanlike and lawyer-like manner. In any event, we recognize that "every slight excess of the prosecution does not require that a verdict be overturned and a new trial ordered." *Aiuppa v. United States,* 393 F.2d 597, 601 (10th Cir. 1968) (Murrah, Ch. J.), cert. denied, 404 U.S. 871, 92 S.Ct. 60, 30 L.Ed.2d 114 (1971).

### III.

### THE CONTENTION THAT THERE SHOULD BE A DISMISSAL OF INDICTMENT BECAUSE OF PRESENCE OF SPECIAL ATTORNEY

Appellant argues that the special attorney of the Department of Justice who presented the case to the grand jury was without proper authorization and that the indictment must be dismissed or, in the alternative, that the case is to be remanded to the trial court for an evidentiary hearing. This issue is raised for the first time on appeal.

■ Objections based on defects in the indictment, other than those attacking jurisdiction or alleging that the indictment fails to charge an offense, are to be made prior to trial; otherwise, they are waived. Fed.R. Crim.P. 12(b), (f),[3] *Bennett v. United States,* 252 F.2d 97 (10th Cir. 1958); *Pytel v. United States,* 378 F.Supp. 294 (N.D.N.Y.1974).[4]

---

**3.** The Notes of the Advisory Committee on Rules states in part:

Among the defenses and objections . . . are the following: . . . presence of unauthorized persons in the grand jury room, . . . . . The provision that these defenses and objections are waived if not raised by motion substantially continues existing law, as they are waived at present unless raised before trial by plea in abatement, demurrer, motion to quash, etc.

The Historical Note to the Rule provides in part:

Subdivision (f) as proposed to be amended provides that the failure before trial to file motions or requests or to raise defenses which must be filed or raised prior to trial, results in a waiver. However, it also provides that the court, for cause shown, may grant relief from the waiver.

**4.** *Cf. Davis v. United States,* 411 U.S. 233, 93 S.Ct. 1577, 36 L.Ed.2d 216 (1974), where the

Thus, "[a] motion to dismiss an indictment based upon the presence of an unauthorized person before the grand jury must be made prior to trial or it is waived." *United States v. Crispino*, 392 F.Supp. 764, 783 (S.D.N.Y.1975).

Here, appellant was indicted in August 1971, and was brought to trial in October 1973. Although appellant had two years in which to challenge the indictment and the special attorney's authority, he failed to do so.[5]

In neither his opening brief nor in his reply brief, does appellant indicate how he may have been prejudiced by the special attorney's appearance before the grand jury. The failure of appellant to raise the issue prior to trial (although he had two years in which to do so) and his failure to show any prejudice or to show cause for non-compliance with Rule 12(b), results in the issue being waived.

## IV.

## THE POSSIBLE PREJUDICE IN CONNECTION WITH THE JURY'S SEEING APPELLANT IN MANACLES

There were isolated incidents in the early days of the trial in which the appellant was exposed to the view of the jurors as the marshals walked him out of the courtroom and down a hallway. Admittedly, these incidents were accidental. Appellant contends that he was prejudiced because it brought home to the jury the idea that he was already a convict anyhow and thus created an atmosphere of guilt. It is noteworthy, however, that when the matter was called to the attention of the trial court the problem was at once remedied. An arrangement was made for the jurors to enter the courtroom in a way which would avoid any confrontation with appellant.

The trial court ruled that these incidents were not such as to prejudice the defendant's opportunity for a fair trial. The cases support the conclusion which the judge reached. *See Gregory v. United States*, 365 F.2d 203 (8th Cir. 1966); *Glass v. United States*, 351 F.2d 678 (10th Cir. 1965); *Way v. United States*, 285 F.2d 253 (10th Cir. 1960). *Compare Anderson v. Watt*, 475 F.2d 881 (10th Cir. 1973); *Watt v. Page*, 452 F.2d 1174 (10th Cir.), *cert. denied*, 405 U.S. 1070, 92 S.Ct. 1520, 31 L.Ed.2d 803 (1972). In these latter cases we held that the appearance of the accused in jail clothing throughout the trial could be, but was not necessarily, sufficient to mandate a new trial.

In assessing the present case we must be cognizant that the evidence itself showed that appellant was in confinement throughout. This fact was communicated to the jury repeatedly throughout the trial, for appellant was in the process of serving time for other offenses. Moreover, there was real necessity for appellant's person being secured while he was being taken to and from the trial. So when the problem is carefully scrutinized, prejudice does not appear.

## V.

## WHETHER THE TRIAL COURT WAS REQUIRED TO SUBMIT LESSER INCLUDED OFFENSES

The contention is that it was error for the trial court to submit first degree murder only to the jury. It is argued that defendant was entitled to have the jury consider the lesser degrees of homicide.

---

Supreme Court held that failure to raise a claim of racial discrimination in the selection of grand jurors prior to trial, in compliance with Rule 12(b)(2), and a failure to show cause for non-compliance precluded consideration of the question in a Sec. 2255 habeas corpus proceeding.

5. On October 29, 1973, just prior to trial, appellant filed a motion to dismiss the indictment on the ground that it did not properly charge him.

Federal criminal procedure does provide for such admissions provided there is evidence to support the lesser offense. *See* Fed.R.Crim.P. 31(c), and *see Sansone v. United States*, 380 U.S. 343, 349, 85 S.Ct. 1004, 13 L.Ed.2d 882 (1965); *United States v. Trujillo*, 497 F.2d 408 (10th Cir. 1974); *United States v. Carroll*, 510 F.2d 507 (2d Cir. 1975); *United States v. Celestine*, 510 F.2d 457 (9th Cir. 1975); 8 J. Moore, Federal Practice, par. 31.03(1); *Keeble v. United States*, 412 U.S. 205, 208, 93 S.Ct. 1993, 36 L.Ed.2d 844 (1973); 2 Wright, Federal Practice and Procedure Sec. 515.

The criteria utilized by other circuits for resolving this issue include:

1. That there has been a proper request by the defendant.

2. The presence of the elements of the lesser offense within the scope of the greater offense.

3. The presence of evidence to support a conviction of the lesser offense.

4. A real controversy as to the presence of the elements of the larger offense such as the element of premeditation, whereby one rationale could result in a guilt of the lesser offense.

*See United States v. Whitaker*, 144 U.S. App.D.C. 344, 447 F.2d 314, 317 (1971); *United States v. Thompson*, 492 F.2d 359, 362 (8th Cir. 1974).

■ The only argument made by appellant here is that the acceptance by the government of Molina's plea of guilty to manslaughter fully justified the giving of an instruction on lesser included offenses. This is not the test, however. The question is whether there was evidence at the trial to support the lesser included offense, and here there was not any such evidence. Only two possibilities exist in the present evidence. One is the conclusion that Coppola had nothing to do with the case and that Molina had carried out the homicide on his own, or, secondly, that a contract, so to speak, existed at the instance of appellant to bring about the killing. There is no basis here for the theory that there was a killing in the heat of passion as a result of a highly provoking injury or that there was a negligent killing. That being so, the tendered instructions were properly rejected. *See United States v. Sinclair*, 144 U.S.App.D.C. 13, 444 F.2d 888 (1971); *Belton v. United States*, 127 U.S.App.D.C. 201, 382 F.2d 150 (1967).

## VI.

## THE LATE PRODUCTION OF RECORDS PROBLEM AND THE FAILURE TO PRODUCE THE WITNESS LEE GORDON

Prior to trial appellant made a broad scale motion for production of

"all records of the United States Penitentiary at Leavenworth, Kansas which concern and relate to the Segregation Building No. 63 during the period September 11, 1968 through December 9, 1968 and which include count sheets, names and cell numbers of inmates, names, shifts and hours of institutional personnel, and names, shifts and cell numbers of orderlies."

The prosecution, however, notified the court and the defendant that no such records existed, but just prior to the government's resting its case a Segregation Unit Log, which contained guard assignments to the Unit and at least some information as to inmates, was presented. The court denied the appellant's motion for a mistrial but granted time to the defendants to examine the log and extended the opportunity to recall any witness that the government had presented. Following the examination of the log, the motion for a mistrial was not pursued nor was a further continuance asked. It is now contended, however, that the refusal of the trial court to grant a mistrial was error in that the log would have supported their theory that Herman was not an orderly at the time that he claimed he was and that he therefore could not have had conversations with Coppola.

■ We fully recognize the duty of the government to disclose evidence favorable to the defense and, particularly, that which is exculpatory. *See Brady v.*

*Maryland,* 373 U.S. 83, 83 S.Ct. 1194, 10 L.Ed.2d 215 (1963); *Moore v. Illinois,* 408 U.S. 786, 92 S.Ct. 2562, 33 L.Ed.2d 706 (1972); *United States v. Hildebrand,* 506 F.2d 406 (5th Cir. 1975). Furthermore, this duty is a continuing one. *See* Fed.R.Crim.P. 16(g). At the same time, the trial court's ruling stands unless there is an abuse of discretion which causes prejudice. *United States v. Dowdy,* 455 F.2d 1253 (10th Cir. 1972). In this case the appellant did not show prejudice.

 In the first place, the log did not purport to show the presence of all of the inmates. The information with respect to these had to be gleaned from the guards' minutes and they entered only such things as they thought were significant. The inmate records pertaining to the Segregation Unit were furnished to the defendant and these showed more than this log did in any event. It would appear that the log had less actual value than it was given for the purpose of argument. We see no basis for disturbing the court's ruling on this.

 As to the failure to produce Lee Gordon, there is no showing of prejudice as a result of the failure to produce him nor is there a showing that he was accessible to the government. On the contrary, the record would appear to support the view that he was not accessible.[6]

## VII.

## THE ALLEGED INADEQUACY OF THE JUDGE'S ADMONITIONS TO THE JURY

Complaint is made that the judge failed to admonish the jurors to refrain from reading newspaper accounts or viewing television or listening to radio accounts of the trial. It is true that the trial court in its admonitions to the jury at the close of the days' sessions and release of the jury did not warn against media reports. The judge did, however, state that he was not going to repeat all of the admonitions given earlier and thus he called attention of the jury to what he had already given. In his preliminary admonition the trial judge fully instructed the jury on this subject. Neither counsel has mentioned this in its brief so that we were under the mistaken impression that no such charge had been given at any time. In the court's preliminary instruction, specific admonitions were made with respect to reports of the media. Under these circumstances the contention loses most of its force and meaning.[7]

 We recognize that it is better practice to repeat this throughout the

---

6. The transcript shows this exchange:

THE COURT: Is there anything else that you have asked the Court that you wanted to do that you want to reoffer to do?

MR. HURLEY: The only other matter that comes to mind is that we ask for the location of Lee Gordon. And the last time I asked Mr. Twitty, his answer was still the same, that he was still unable to locate him. Is that correct, Mr. Twitty?

MR. TWITTY: That is right. The last known address we had for Lee Gordon was Terminal Island, California.

MR. HURLEY: I was assuming that was still the same. We can't locate him on our own either.

7. The full text of the court's preliminary admonition is as follows:

. . . although this Jury has not been finally selected, those in the Box are still potential jurors as are those who are not yet called in the Box, and you will all be under the admonition which I am about to give you. You may not and you must not discuss this case among yourselves or with anyone else or permit it to be discussed in your presence until it is finally submitted to you. You must not read, or listen to or watch any mention of this case in any of the news media, the newspapers, the television or the radio if it should be mentioned at any time. You must not do this. This is because you must, that is those of you who sit as jurors must base your verdict wholly and entirely upon the evidence introduced in the courtroom and not by any other information from any other source. You must not express or form any opinion as to the guilt or innocence of the Defendant until this case is finally submitted for consideration . . .

trial. *See Schoeneman v. United States*, 115 U.S.App.D.C. 110, 317 F.2d 173, 178 (1963); 1 Devitt & Blackmar, Federal Jury Practice and Instructions Sec. 5.03. However, we see no prejudice to the defendant here. It is not even argued that the defendant was injured by the omissions. *Cf. United States v. Accardo*, 298 F.2d 133 (7th Cir. 1962) as an example of massive press publicity during the trial with inadequate admonitions. The omissions in our case during the trial were non-prejudicial and harmless. *Cf. Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967).

## VIII.

## THE CONTENTION THAT PLEAS OF GUILTY OF CODEFENDANTS MOLINA AND BACA PREVENTED AS A MATTER OF LAW THE CONVICTION OF COPPOLA

All three of the above mentioned individuals, and Cordova as well, were indicted for murder and conspiracy to commit murder. Molina and Baca were allowed to plead guilty to voluntary manslaughter, and the charges against Cordova were dismissed. Appellant argues that these pleas preclude his conviction for murder on some theory of res judicata, double jeopardy or collateral estoppel.

It is clear that res judicata does not apply because appellant was not a party to any of the plea bargaining, and the adjudications based on the pleas of guilty to voluntary manslaughter do not affect appellant. Similarly, he was not placed in jeopardy by his codefendants' pleading guilty.

With respect to collateral estoppel, the argument is that the trial court may not accept a guilty plea unless there is a factual basis for it under the Federal Rules of Criminal Procedure, Rule 11. Hence it is argued that this is a finding and conclusion of guilt of manslaughter which somehow excludes a murder conviction of appellant. The applicability of collateral estoppel as to the appellant is urged. But the trouble is that the court's finding that there is a factual basis for the plea of manslaughter is not necessarily a finding that the evidence supports this offense only. In any event, it does not foreclose any issue of murder as to appellant because that was not litigated in the plea of guilty proceedings. *Cf. United States v. Callahan*, 445 F.2d 552, 554 (9th Cir. 1971).

It is argued also that the pleas of guilty of Molina and Baca are binding on appellant based upon the proposition that if the principal is not guilty of murder, neither is an aider and abettor. But the acquittal of the principal does not necessarily foreclose prosecution of the alleged aider and abettor. *See United States v. Musgrave*, 483 F.2d 327, 331–32 (5th Cir.), *cert. denied*, 414 U.S. 1023, 94 S.Ct. 447, 38 L.Ed.2d 315 (1973). Nor do we see any merit to the contention that the dismissal of the conspiracy charges as to Baca and Molina automatically bars the conviction of appellant. This dismissal is not equivalent to a judgment of acquittal.[8] It is merely a compromise and not a finding that the evidence was insufficient to convict Molina and Baca of conspiracy. Hence we see no inconsistency. We find no substantial merit to any of this.

We have also considered the lengthy argument that the trial judge

---

8. The cases appear to hold that for there to be a bar to the conviction of the remaining codefendant, the other codefendants had to have been acquitted. *See, e. g., Romontio v. United States*, 400 F.2d 618 (10th Cir. 1968); *United States v. Goodwin*, 492 F.2d 1141 (5th Cir.

1974); *United States v. Gardner*, 475 F.2d 1273, 1277 (9th Cir. 1973); *United States v. Fleming*, 504 F.2d 1045, 1055, fn. 9 (7th Cir. 1974).

\* \* \* \* \* \*

unlawfully restricted the cross-examination by appellant's counsel. What the appellant sought to elicit from the witness Gove was that Molina had said to him he had killed Hardaway and had pleaded guilty to manslaughter. Gove did testify that Molina said he had killed Hardaway and had pleaded guilty, but was not allowed to say that he had pleaded guilty to manslaughter. The effort was not to undermine the credibility of Gove, it was rather to prove the manslaughter as an aid to the appellant. For this purpose it was irrelevant. The court ruled correctly.

Determination of the scope of the cross-examination is within the discretion of the trial court. We see no abuse of this discretion. *Cf. United States v. Jackson*, 482 F.2d 1167, 1176 (10th Cir. 1973). Similarly, we see no prejudice in the limitation of appellant's cross-examination of the witnesses Brady and Gawne. These two are collateral matters and the court has a discretion to restrict cross-examination in these areas. *See United States v. Stamp*, 147 U.S. App.D.C. 340, 458 F.2d 759, 773 (1971). Appellant's counsel's cross-examination of these witnesses convinces one that an adequate opportunity was given to cross-examine and that there was no error.

Finally, considering the difficulty of the trial including the offense arising in a penal institution, one is impressed with the fact that the defendant had a full and a fair trial. He was well represented both in the trial court and in this court, and also the trial court exercised care in the conduct of the proceedings.

The judgment of the district court is affirmed.